Good morning, Your Honors, and may it please the Court. My name is Brian Feldman. With me today at Council's table is Ellen Merriweather. We represent the appellants who are federal health centers. They provide services to the uninsured and the underinsured. And they brought this litigation because they lost hundreds of thousands or millions of dollars, and their class members, billions of dollars, when the four defendants suddenly stopped shipping discounted drugs to their contracted community pharmacies. Now there's other litigation pending in other courts about whether the 340B statute permits or prohibits those actions. This appeal is about a separate question. Okay, so just to clarify, appellees contend that you've forfeited your state law claims by not appealing the district court's ruling as of now. Is that something? We did not forfeit those claims. Okay, I just have to keep it so we can move on. Absolutely. That was all the question I needed. Okay. There was only one ground that applied to all the claims. The question before this Court is a factual one, right, or in this case, which is how did they pull it off? A thousand drug companies for 10 years did the same thing. They provided these discounts at contract pharmacies. None of them preferred to be providing discounts. They preferred to charge full price. But everybody stayed in line until these four defendants in 2020, in just several months, changed course. The key question is how did that happen? And the answer is— You earlier said that—I think you used it and there you just said that. It seems to me the whole question is what is the it and what is the that? The parties dispute how to characterize what the conduct is as well as the timeline. And so why don't you tell me how we should—how you think about the right level of generality to understand the conduct and what authority do we look to to guide us in assessing that level of generality? Certainly. Page 32 of the blue brief has the four charts, right? That is the conduct. You see that there are high levels of discounting happening and then they drop off the chart for each of the four defendants. That is the parallel conduct. So are we, in terms of legal relevance, more concerned about the effect of the conduct? Even if the effect is achieved by different means? Or are we actually having to look at the conduct? You're looking at the conspiracy. And the conspiracy alleged is to decimate contract pharmacy sales, which all of them achieved. As to particularly how they did that, they each had the same rule. They each adopted the same rule. We're going to stop shipping to contract pharmacies. Then they adopted different exceptions, right? We have a single pharmacy exception. We have an insulin at cost exception. We have—we're going to exclude these particular covered entities. Those exceptions differed. But the rule was the same and the result was the same. The variety here is much less variety than in Twombly itself, right? In Twombly, the question was thwarting—the incumbents thwarting newcomers. And at each level, the Supreme Court and at this court, the conduct involved sabotaging customers. That's what some of them did. It involved not signing up lines with the newcomers. It involved— There's a debate in the papers about Twombly with the other side emphasizing the idea that even though there was different kinds of conduct, all of the defendants engaged in all of the conduct, I think is how they describe it. How do you see that? We cite the actual complaint in the reply brief and the complaint specifies in Twombly. The allegation was defendants engaged in one or more and there's a laundry list that follows. So it's just not factually true that the allegation before the court in Twombly— I mean, but the Twombly as authority isn't really about parallel contact anyway. So I'm not sure what we get. It is part of the whole thing, right? But it's—the analysis is focused on the plus factors. And so it's hard to know what to draw from that. Is there other authority that you think guides us on that? Well, any production case, right? For instance, the broiler chicken case, the court says it's actually more plausible—this is in the Northern District of Illinois 2017—it's actually more plausible for conspirators to agree on their ends and to leave the precise means to get there to each of the co-conspirators. As the Fourth Circuit explained in SD3 v. Black & Decker, otherwise it raises a red flag. What did they want to achieve? They wanted to achieve—this is what's alleged—what nobody had ever achieved, which is exiting as much as possible the contract pharmacy market, right? And they did that in droves, between 70% reductions and 95% reductions. This conspiracy was a smashing success. Your Honor, Judge Nathan, in Compass v. Redney, you explained we don't even have to meet the if the complaint on its own is already plausible, and here it is. Because we have 1,000 drug companies hemmed in by the status quo because of the threat of exclusion. Right? The exclusion threat, if you look at the 28J letter, that stopped J&J from having an innovation in which it was going to reduce its 340B payments. And— Can I ask— Yes. Just because your time's running out, I want to finish, if you like, but please do get to adequate alternative theory, because I'd like both sides' guidance on how to think about that at the pleading stage. I'm sorry— Adequate alternative—the adequate alternative theory, so the decision essentially not to return regulation—the decision not to regulate in the way— The ASTRA argument? Is that the argument you're referring to? I don't know. Or the Credit Suisse argument? The argument that President Trump's EO didn't do anything, and that that explains why the entities—why the defendants sort of took action in their own hands, potentially independently. We don't have to show that we have the only theory, but we really do. The only coherent explanation of what happened, why 1,000 drug companies kept the status quo and only— Just what you said. You said we don't have to show that it's the only theory, and that has to be right, but— That's Anderson, yes. So you suggest that this—can an adequate alternative theory ever prevail on a motion to dismiss? No. Anderson News says we don't need to show the most plausible theory, right? And there can be plausible alternatives to the theory of the complaint. On a motion to dismiss, that's sufficient. It just has to be plausible. And the only explanation— Don't stress about your time, because we're going to keep you here as long as we need  Thank you. Thank you. The only explanation, the only coherent way to see what happened, to understand why four out of 1,000 were the only ones who held hands and moved together, is to avoid exclusion, right? That they control the diabetes market. They had a chokehold. The government's response—this is in the 28-J—to Johnson & Johnson, the biggest drug company in America, when it stepped forward alone, was to say, we're excluding you. Now, the defendants had confidence that that wouldn't happen to them, even though it kept everyone in line for 10 years, and everyone else stayed in line until the government said on May 17, 2021—this is in paragraph 173 of the record, of the Second Amendment complaint at 826—on May 17, 2021, the government said, here's what we're going to do about this. And it wasn't to exclude them. That is the dividing point. Only after then does any other drug company in America follow suit. These are the only four for that entire period, before the government says, we're taking exclusion off the table. What explains that? It's their chokehold on the diabetes market. There's 30 million Americans with diabetes. They realized that if they held hands together and said, if you exclude us, you're losing all of these diabetes medications, right? That's not viable for the government, because exclusion means throwing them out of Medicare and Medicaid coverage. That would mean all the Americans on Medicare and Medicaid would not be able to get their diabetes medication. That was the leverage that these four alone held that allowed them to pull this off. Nobody else could do it. And it's the only explanation for why these were the only four who did this. Everyone in the drug industry was lobbying Congress to change 340B. It wasn't just them. And that's alleged in the complaint at paragraph 6, 115, 129, and 130. The entire drug lobby was disappointed. It was Air 340B, the drug lobby's 340B industry-wide association that said, what a terrible executive order. That's 129. But my understanding is that the defendants are arguing that the 340B pricing was a financial loss to them, and that they would want to each individually pull out, without even needing to consult each other, because they've had their own independent incentive. Why is that wrong? The independent incentive is rebutted by 10 years of choices by them, to the contrary. And 996 other drug companies were similarly situated who did not do the same thing. The reason that is not something they would stick their neck out and do is shown by the 28J letter. When Johnson & Johnson did it, the government said, we're excluding you. Johnson & Johnson had to pull back. They could not succeed in doing this unless they could corner the government and get the government not to exclude them. They uniquely could. They had a chokehold on the diabetes market. They had 100% of that market. And so they were able to tell the government, you can exclude us, unless you're picking and choosing, you're going to lose all the diabetes medications. That's how they were uniquely situated. And thank you for indulging me in appearing by Zoom due to a conflict in scheduling. But I did want to ask you, how does, and this may be getting into the plus factor analysis, but how does the fact that they hired the same lobbyist, and I know that's alleged as well, how does that impact your analysis, if at all, on the, how it relates to the parallel conduct and what they did subsequent to the executive order? Or is that more of a plus factor? It's both. It's both how this is plausible because it shows how they had the opportunity to conspire. And that is one of the plus factors, inter-firm communications, Your Honor. That is one of two big inter-firm communications. Because they were all using, all four of them, the same lobbyist, in July of 2020, on 340B restrictions, they had an opportunity to hatch this plan. I would add, the other thing we allege is that the CEOs of all four companies were on the board of pharma in July of 2020. One of them is the executive vice president, but EVP and three CEOs. And their most prominent advocacy issue at that time was 340B reform. These are two routes for them to conspire. So I, my question though, is that having to do with more of the opportunity to collude rather than colluding? Like, do we have to, do we have to parse that? It's where we don't have, because of the posture that we're in. Because it's a motion to dismiss, you don't have to, we have enough for the plus factor. And right here, it's more than a mere opportunity. We have them in the room talking about 340B, presumably, right? We have evidence to allege that. Just one more point on, on plausibility. The odds. Oh, yes, your honor. Just to follow up to that, then I take it your point at the motion to dismiss level when drawing all inferences in favor of your client, the inference you'd want us to draw is that by hiring the same lobbyist, they had a common goal to achieve the same thing is and, and that that goes both to parallel in terms of whether what they engaged in after the fact was parallel conduct, as well as the plus factor in the, to infer communications between them. I think we're only asking the court to infer that there was a plausible means for them to reach this conspiracy, not just that they were in the same association, which the courts reject, but they were in, in groups that were talking about this issue. It's like in Ross where there were arbitration clause meetings, right? And the court found that that was a sufficient basis to, to, to show that they had an opportunity to conspire on those specific points. Just one more important point about plausibility. The odds that these four of the whole industry just happened to own the diabetes market would be the four who would conspire. The only four to buck the trend before May 17th when exclusion came off the table is almost zero. It's 0.000000. Their eight zeros, 24%. And if you take all of the drug firms that had since then over the last five years imposed restrictions and say, what are the odds that these four went first? It's still 0.08%. It's very implausible. And the only other theory for why these four out of all the drug industry would do it is a follow the leader theory. Sanofi announces first on July 27th and maybe the competitors in the drug diabetes industry were watching and followed suit. But we know in this case, and we see a pattern of the change in the policy, and I understand your timeframe would exclude that, but that they start making changes to copy what others before them. But what's, what's most significant that fits our theory like a glove is those changes don't come until after May 17th, 2021. Everyone's waiting to see, is the government going to exclude these entities? And when the government doesn't, only when exclusion is off the table, because that's what's been disciplining everyone for 10 years. That's the only point when others jump in and exclusion comes off the table on May 17th, 2021. The first additional drug company other than these four to impose a restraint is in December of 2021. So take some time. And then they come dribbling in. The other possibilities follow the leader, just to finish the thought, we know here that this was not follow the leader. It wasn't that Sanofi said, first, I'm going to do this restraint. And then everyone else thought it was a good idea because in the other litigation, what's come out, and this is pled, is AstraZeneca in advance of Sanofi, one day prior, committed to the same type of restraint. We're going to stop contract pharmacy, which means either they were talking to each other and planned it, right? Or they all four, as we allege, were conspiring together. It's not possible that one just got the idea by watching in the open market what the other was doing. So I think this case presents a very thin line here between asking your clients to plead enough plausible facts to support the legal conclusions and illicitly drawing inferences against your clients at the pleading stage. And I think what might help me is if you could tell me what you think your strongest plus factor is and what precedent you think best supports that that is a meaningful plus factor. Absolutely. We have all of the plus factors, but probably the first one is the easiest historically unprecedented conduct. That comes from Twombly. This is what Twombly was imagining. And this is not Twombly where everyone continued on the status quo, nor is it the other cases like Mayer and Council of Baltimore, where the entire industry in mass changed from the status quo. So the defendants say, and I appreciate your response, it's not unprecedented because we're trying to go back to a restriction to one contract pharmacy at a time. So it's not unprecedented. Yeah, let me address that. It is unprecedented since HRSA created the exclusion threat. So the statute is written into that as an exclusion threat. If you violate the statute, obviously a material violation, you can be excluded from Medicare and Medicaid. What changes, which is why this starts 10 years ago, is that in 2010 HRSA for the first time says, we are requiring you to send to contract pharmacies, to every contract pharmacy that a covered entity might have, discounted drugs. So the threat of exclusion begins in 2010 and continues forward. So the threat that hemmed everyone into this conduct is consistent throughout, and there was that status quo held. This is unprecedented from the right starting point, which is when the status quo started. And so those are very powerful cases. It's very telling what the difference here is between Mayor and Council of Baltimore and STAR. The whole industry is going one direction. These four are going another direction. And that's very, very important. I think it's our strongest plus factor. But we also have the next plus factor, which is it's not in their independent interest to do this on their own. Sure, they want higher drugs, but they don't want to be excluded. See Johnson & Johnson in our 20HA letter, which is what happened to Johnson & Johnson when they acted alone. The third plus factor, a motive to conspire, absolutely- I asked for the strongest. I didn't ask for anything. Okay. I won't go through them all. Unless my colleagues have questions, I think we'll hear from you on rebuttal, and I would tell your colleagues, same thing. We're going to keep you as long as we need you. So don't stress out about any differential in time. Thank you. Thank you, Your Honor. May it please the Court. In light of well-documented abuses of the 340B program, and following the failure of executive action to address the problem, at least a half-dozen drug manufacturers, four of them defendants here, adopted restrictions on contract pharmacy sales that varied in terms of their timing, their content, and their effects. As Chief Judge Wolford explained, these actions from manufacturers facing similar market conditions were consistent with their obvious self-interest in restricting highly unprofitable 340B sales. Right. But at the motion to dismiss stage, don't we have a similar enough effect here? So even accepting that there's a similar enough effect, I actually think timing, which they articulate as their strongest argument, undermines them in several different ways. So first of all, their timing argument is self-contradictory. On the one hand, they say that these drug manufacturers staggered their announcements over the course of four-plus months in order to evade detection. On the other hand, they say that AstraZeneca and Sanofi announced their restrictions so close in time, it just couldn't have been coincidence. So which is it? That's not, I mean, that's a matter of degree, right? So respectfully, I apologize. No, go ahead. It's not a matter of degree. Those directly contradict each other as an explanation for the timing. Okay, but does that mean that you're asking us to suggest that there's a per se amount of time that needs to be close enough in order for it to be parallel, or is there a bit of squishiness in this? So Your Honor, it's not about the specific amount of time. It's about whether the time suggests something. It's whether the time suggests parallel conduct that is not just attributable to people in the same market responding to similar market conditions, but instead suggests a meeting of the minds. And there cannot be a meeting of the minds that says these sophisticated drug manufacturers cleverly staggered their announcements over the course of four months to evade detection, but also somehow made the irrational decision. Why not? Like, why couldn't they have colluded together to cleverly stagger it to avoid detection? So they could have done that, but not at the same time that they stupidly clustered AstraZeneca's announcement only one business day away from Sanofi's announcement. That's what doesn't make sense if they're being clever. Okay, but then again, that's asking us to weigh facts and strike inferences, right? I mean, and do we do that here? Respectfully, I think it's asking for plaintiffs to come up with a coherent theory of what was going on that suggests an actual meeting of the minds. And I think to your point, Judge Nathan, there's a very obvious explanation for why AstraZeneca and Sanofi announced when they did. And it's one that plaintiffs themselves allege. So if you look at page 25. So how do you think of that and what cases do you look to to give guidance here? Because of course, if it's an alternative theory, there are inferences available to both and therefore we would typically say it gets past the motion to dismiss. So is this an argument that can prevail at the motion to dismiss stage and how? So the reason that it prevails is that it's plaintiff's own theory. In their opening brief at page 25, they describe trying to get an executive action as plan A for these manufacturers. And that failure became evident. That's paragraph six of the complaint. Failure became evident when there was an executive order that was largely meaningless. That was paragraph 131 of the complaint. At that point, they switched to plan B. And it's not a coincidence that AstraZeneca announced on July 24th, 2020, which was the exact same day that the executive order came out and that Sanofi announced the next business day. So that is not just a possible explanation. It's the explanation that they themselves give. Right. But why isn't that understood to be the trigger, right? We have a conspiracy that we're not going to trigger unless something else happens. So we acknowledge that it is conceivable that it could be a trigger, but conceivable is not the standard. The question is, does the timing take us out of neutral territory, to borrow a phrase from Twombly? Does it suggest that this wasn't just the type of activity that you would expect from manufacturers all of whose plan A just failed and who were all facing similar market pressures? But I think the timing actually eviscerates their main motivation theory as well. Because as they acknowledge, all of this spacing happened, the announcements, between July and December. Now, they have a theory. Counsel, isn't it plausible that they came up with a plan, an inference, a plausible inference from the complaint, that they came up with this plan to engage in slightly different conduct to achieve what they sought to achieve through their lobbying efforts that became unsuccessful? So when you combine the timing and the slightly different conduct, all designed to achieve the same result, why isn't it, at the motion to dismiss stage, a plausible inference or a plausible theory? So I think it's a conceivable theory, in the sense that we can't absolutely rule it out. But it's not plausible to think that sophisticated drug manufacturers would have staggered to avoid detection, but then announced within one business day for two of the participants in the conspiracy. That is not plausible, and at minimum, it's not a plus factor that you would look to. But I think the timing... Oh, that just, you know, they thought, one might argue, it's a clever attempt to disguise the conduct by spreading it over time, just not well done. It was intended to be cleverly done, but failed in that one instance. So respectfully, Your Honor, these are incredibly sophisticated, multi-billion dollar businesses. They don't even allege why it would make... You're making an argument that they're sophisticated. They would be sophisticated at illegal collusion, not just sophisticated at business, right? That's what we have to assume is implausible. Sure. So again, at a minimum, there has to be some theory, and plaintiffs give us none, as to why that would make earthly sense. They haven't articulated any reason why you would cluster at the beginning and then stagger later on. No, I thought they did. Didn't they assert that there were big policy changes that take time to vet, and that the reason some of them were able to go so quickly was because of the changes were ready to go at the same time that they had agreed before to do that, and others intended to do the same thing, but they came a little later? So there's no articulation as to why AstraZeneca and Sanofi were ahead of the others. But I want to get to the point that it actually undermines their main argument that they did this and moved together in order to avoid government sanctions. So they say that the four-plus-month time period is not a problem for their market share theory, because it takes time for patients to switch from one drug to another. They have no similar allegation, nor could they, with respect to the time that it would take for the government to threaten a manufacturer with sanctions. And to the contrary, they specifically allege, at paragraphs 166 and 167, that HHS did in fact threaten these manufacturers with sanctions in September twice, once on September 2, another time on September 21. Well, that was several months before Novo announced. So if these manufacturers were clustering together in order to protect themselves from sanctions, they would have had to do it fast enough that HHS wouldn't have had a chance to respond. No explanation for why they waited until December for Novo to do it, knowing that HHS could obviously respond much faster than that. But they have another problem with their government sanctions theory, which is that they don't equally vulnerable to civil monetary penalties, which they themselves describe as a dire sanction. I think it's a devastating government sanction in page 39 of their opening brief. And I want to just drill down on this for a second. Each violation under the statute subjects a manufacturer to more than $5,800 for an overcharge. So if you charge the non-340B price when you should have charged the 340B price. They allege that each manufacturer saw a drop just within the first month of more than a million 340B sales, which means that each manufacturer was facing more than $5.8 billion of civil monetary penalties just for that first month, which is obviously a devastating sanction. The only thing that could have protected these manufacturers, and they were not protected by moving together. And in fact, they were all threatened along with United Therapeutics and Novartis, which is why we have the D.C. Circuit Novartis litigation. So the only thing that could truly protect a manufacturer was what ended up happening, being vindicated about what the statute meant. That was not an argument for why they had to move together. With respect to their market share theory, this theory is also eviscerated by their own allegations because they admit that in May of 2020, before any of the other action, Lilly restricted 340B sales for its blockbuster drug Cialis. It was an entirely uncoordinated move. So if moving uncoordinated would lose you in 340B market share, and that was harmful for some reason, then what was that about? More than that, AstraZeneca, which doesn't make any insulin products and has only a 5% market share in Incredent Mimetics, they restricted 25 other products at the same time. So I mean, this to me goes down to, I mean, it's partially their theory, but partially its similarity. And do we have, is this a question of first impression for us about how similar the parallelism needs to be in order for us to find parallelism? Or do you think we have enough? So Your Honor, I think parallel conduct is questionable here, but sort of beside the point because they don't have anything other than the fact that these are roughly similar effects from policy changes scattered over the course of about five months. They don't have any plus factors. And they also, you know, rely on the idea that these were the only manufacturers who moved. The only ones who moved were the ones who had diabetes product, again, ignoring that there were restrictions of other products, which wouldn't have made sense if they were worried about losing 340B market share. But they ignored that there were two other drug manufacturers who moved during this time, United Therapeutics and Novartis. And I want to be very careful because I know we're here on a motion to dismiss. In paragraph 159 of their complaint, they acknowledge that Novartis and United Therapeutics both announced changes to their 340B policy. They say that United Therapeutics didn't implement the changes until later. But of course, it's the announcement that could potentially lose you the market share because people can start switching between the drugs. And it's the announcement that opens you up to sanctions from HHS. With respect to Novartis, they state that Novartis asked but did not require covered entities to use a certain platform. And that's accurate but deeply misleading because what they don't tell you and what the DC Circuit decision tells you is that Novartis also restricted covered entities that used contract pharmacies more than 40 miles away. If you were a hospital, you were not allowed to use a contract pharmacy located more than 40 miles from the hospital. And you can see that in the DC Circuit's decision. So taking that into account, that was in November for both of those drug manufacturers. So these aren't even just the four, the only drug manufacturers moving during this period, which again undermines their mathematical argument that it just couldn't have been a coincidence that it was all diabetes makers. I want to, unless the court has questions, but I want to switch. I've got a question on Illinois Brick. Please. What do we do about Illinois Brick? Sure. So they don't dispute that they are indirect purchasers. They make instead two arguments. So one of their arguments is that Illinois Brick just doesn't apply to injunctive relief. This court has never held that. Supreme Court has never held that. In the Apple versus Pepper decision, it reserved the question in footnote one. Four of the dissenters in footnote one of their opinion explain why it obviously does apply to injunctive relief because it's a matter of proximate causation, which applies to all forms of relief. The second argument they make is that there are no overcharges here, but that directly contradicts their complaint. So in paragraph 352 of the complaint, they say, quote, overcharges. The remedy they seek, I'm sorry, I don't have the quote here. In paragraph 352, they refer to the remedy they seek as remedying these overcharges. They refer to overcharges in 354 and 355 as well. They say that being charged the non-340B price when you should have been charged the 340B price is an overcharge, and Illinois Brick obviously does apply to overcharges. But the question for me more specifically is, is it us or a district court that should decide it in the first instance? So it's very much up to this court's discretion. It's an alternative basis for affirming. OK. And would you have a position on granting mosaic leave to file a renewed motion to amend? So our position on this is that we're here on a second amended complaint. This is their third bite at the apple. They did not ask for another chance to amend. As far as I know, my friend will correct me if I'm wrong about that. But at a minimum, they haven't identified any additional facts that they're actually able to plead in order to overcome the problems with their complaint. So I think it was well within the discretion of the district court not to give them a fourth bite at the apple. Thank you so much. If I may start with the timing arguments and then the overcharge civil monetary penalty arguments which go together. Yeah, I'm going to hold you tighter to the time on the record.  But I need to correct the record repeatedly and including in the brief. The other side says that AstraZeneca announced within two days of Sanofi. It's not true. And that's not what is alleged paragraph 135, which is on A14. They waited until mid-August. So it was staggered. The context of how fast to move is based on how fast the threat is coming. Exclusion was a slow-moving threat. It's not when you announce what you're going to do. It's when you implement it. And the threat didn't come until May. There was plenty of time for each of these to wait before that threat arrived. In terms of precedence, we have Ross 4.5 years of parallel conduct, which is parallel. One of the movers was a year apart from everybody else. This is comfortably within their and modern home is four months. On civil monetary penalties, it's nothing like what Eli Lilly calls the nuclear option and the death penalty. And they have full defenses they've asserted to any of those civil penalties. Those are pages 818 through 820 of the joint appendix where they articulate that there were no overcharges. Now, yes, we allege that there was slippage, right, that although the restraint was not to sell, that sometimes they messed up and sometimes they sold. But that's the only, that slim read of mistakes or where we have overcharges, and that's a backup theory. The main theory is the one they articulated, 818 through 820, which is this restraint was we're not selling to covered entities. We're no longer doing the ship-to arrangements. And that's why we went on Illinois brick, too, Your Honor. There are no overcharges. As Judge Posner said in the Seventh Circuit, an in-write brand name, drug litigation, anticipating this. Illinois brick is ruled about overcharges. Where there's no sale, there is no Illinois brick bar. And this Court can go ahead and decide that. It would be helpful and illuminating for the District Court below. Final point, which is that on Cialis and on the executive order, on Cialis, they say the inference the Court should draw is that Eli Lilly was willing to do a little something, and therefore, they weren't waiting for the conspiracy. We say the stronger inference is absent the conspiracy. Eli Lilly wasn't willing to do anything but a blip. Cialis, if you look at the charts on page 32, actually, the savings went up after May. They didn't go down. Eli Lilly wasn't willing to jump in until there was a conspiracy. For all these issues, we're on a motion to dismiss. Anderson News says we get the reasonable inference. If something cuts both ways, the executive order or Cialis, the executive order affected everyone, only they took action, on a motion to dismiss. The tie goes to the plaintiff, and this case should be able to proceed further. Thank you, Your Honors. Thank you, this was very helpfully argued. We will take it under advisement.